# UNITED STATES DISTRICT COURT
### for the

Middle District of Florida

| | | |
|---|---|---|
| United States of America<br>v.<br><br>Hannah King<br>Robert George Owens<br><br><br>_Defendant(s)_ | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No.    8:25-mj-3000-CPT |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ March 2025 ~~September 2025~~ _____ the county of _____ Hillsborough _____ in the _____ Middle _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846 & 841(b)(1)(B)(vi) | Conspiracy to Distribute 40 grams or more of a Mixture and Substance Containing a Detectable Amount of Fentanyl |

This criminal complaint is based on these facts:

See Affidavit.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

David B. Bannan, Special Agent, FBI
_Printed name and title_

Sworn to before me over the telephone or other reliable electronic means and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date: SEPTEMBER 11, 2025

_____
_Judge's signature_

City and state:    Tampa, FL

Hon. Christopher P. Tuite, U.S. Magistrate Judge
_Printed name and title_

# AFFIDAVIT IN SUPPORT OF COMPLAINT

I, David B. Bannan, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I submit this affidavit in support of a criminal complaint charging Hannah King ("**KING**") and Robert George Owens ("**OWENS**") with conspiring to distribute 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 846 & 841(b)(1)(B)(vi). This affidavit does not contain all information pertaining to this investigation and merely provides probable cause for the requested complaint. I have personally participated in the investigation described below and am familiar with the information contained in this affidavit either through personal observations or those of other law enforcement officers.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since September 2019. I am presently assigned to the Tampa Division, where my duties include investigating violations of federal laws, including violations of 21 U.S.C. §§ 841, 843, and 846 (drug trafficking). Prior to joining the FBI, I served as a Special Agent with the United States Postal Service (USPS) Office of Inspector General (OIG) for approximately four years. While employed there, I investigated the unlawful transport of controlled substances through the U.S. Mail.

## PROBABLE CAUSE

3.      Around March 2025, an FBI Confidential Human Source (hereinafter "CHS") identified **KING** as a fentanyl distributor.[1] Since that time, law enforcement has conducted several controlled buys with **KING**. For each transaction described below, the CHS was provided audio and video recording equipment. The CHS was searched before and after each transaction for any unauthorized contraband or money; neither were found for each instance. Following each transaction, the CHS met with law enforcement at a predetermined location to relinquish custody of anything believed to be of evidentiary value.

4.      On or about May 19, 2025, CHS conducted a controlled purchase of approximately one ounce of suspected fentanyl and a small quantity of suspected LSD from **KING** at a house on James Court in Zephyrhills, FL (the "James Court Address"). Prior CHS reporting revealed that **KING** was residing at this location at the time. The CHS was equipped with audio and video recording device and was provided U.S. currency for the controlled purchase. Law enforcement searched the CHS for contraband. No contraband was found on the CHS. Law enforcement conducted physical surveillance and maintained a visual of the CHS until CHS

---

[1] CHS has no felony convictions but was previously charged with possession of a controlled substance, charges that were later dropped. CHS is cooperating with law enforcement for monetary compensation. CHS is familiar with members of this drug trafficking organization (DTO) from prior interactions with members of the DTO. Information that has been provided by CHS has been corroborated through multiple investigative techniques, including physical surveillance, controlled purchases of narcotics, and database queries. The CHS has been paid by the FBI approximately $3,700.00 between June 2025 and August 2025 for services in support of this investigation.

entered the residence. Law enforcement also maintained a visual of the CHS following the controlled purchase until the CHS was debriefed by law enforcement and turned over the purchased narcotics to law enforcement. **KING** can be observed on the video recording during portions of the deal. **KING** was observed on the video counting the cash provided by CHS and handing CHS a plastic bag containing the suspected narcotics, as shown in the photograph below.



5.      On or about May 30, 2025, CHS conducted a controlled purchase of approximately two ounces of suspected fentanyl from **KING**, again at the James Court Address. The CHS was equipped with audio and video recording device. **KING** could be observed on video during a portion of the meeting, as shown below:



6. On or about June 10, 2025, CHS conducted a controlled purchase of approximately three ounces of suspected fentanyl from **KING**, again at the James Court Address. The CHS was equipped with audio and video recording device. **KING** could be observed on video during a portion of the meeting, as shown below:



7. On or about July 17, 2025, CHS conducted a controlled purchase of approximately three ounces of suspected fentanyl from **KING** at a house on Avalon Drive in Zephyrhills, FL 33541 (the "Avalon Drive Address"). The CHS was equipped with audio and video recording device. However, no parties were captured on video recording during this meeting because the CHS appears to have kept the recording device in their pocket. I have reviewed the audio recording from that event.

8. When CHS first arrived at the Avalon Drive Address, CHS was greeted by an individual who introduced himself as "Bobby." **KING** also stated during the meeting that Bobby was "Rick's brother." During the drug transaction, CHS discussed introducing CHS's associate to **KING** and "Bobby" so that CHS did not have to broker narcotics transactions. **KING** and "Bobby" were not receptive to this idea and "Bobby" stated, "Why ruin a good thing?" Based on my training and experience, I believe "Bobby" was telling CHS that it was unwise to introduce another party to **KING** to purchase fentanyl. I believe this conversation shows that "Bobby" is familiar with the sale of narcotics.

9. During the debrief with CHS on or about July 17, 2025, CHS identified "Bobby" as **OWENS**. The CHS advised law enforcement that **OWENS** counted the money that the CHS provided for the suspected fentanyl and was present for the exchange. The CHS also said that they saw two handguns inside the Avalon Drive Address. CHS also heard **OWENS's** voice at that meeting.

5

10. Florida Driver and Vehicle Information Database (DAVID) shows OWENS's current address as the Avalon Drive Address. According to Florida Department of Corrections (DOC) records, **OWENS** was released from DOC custody on or about July 3, 2025—about 15 days prior to this narcotics transaction.

11. DEA chemists have confirmed that the fentanyl purchased at each buy in this affidavit is, in fact, a mixture and substance containing a detectable amount of fentanyl.

12. On or about August 20, 2025, CHS attempted to conduct a controlled purchase of narcotics from **OWENS** at the Avalon Drive Address. The CHS was equipped with audio and video recording device, and a portion of the operation was captured on video. When CHS arrived at the Avalon Drive Address, CHS encountered an individual ("Person 1"). Person 1 instructed CHS to enter the Avalon Drive Address.

13. During a debrief with the CHS on or about August 20, 2025, the CHS advised that **OWENS** was in the back bedroom of the residence but did not exit while CHS was present. The CHS could hear **OWENS's** voice.[2] The CHS advised that after the CHS told Person 1 that the CHS was there to buy "work," Person 1 told the CHS that **OWENS** did not have "work" but had "boy." The CHS departed the Avalon Drive Address shortly after without purchasing narcotics from the residence. Based on my training and experience, I know that "work" is a term used

---

[2] CHS is familiar with **OWENS's** voice from the July 17, 2025 meeting with **KING**.

to describe methamphetamine and "boy" is a term used to describe fentanyl or heroin.

14. On or about August 27, 2025, and August 28, 2025, PCSO deputies conducted physical surveillance of the Avalon Drive Address. During surveillance, PCSO deputies observed several individuals in vehicles and bicycles arriving and departing the Avalon Drive Address. Based on my knowledge, training, and experience, I know that residences where narcotics are sold from, often have heavy traffic and are frequently visited by narcotics users and purchasers. I believe what PCSO deputies observed during these days was indicative of narcotics being stored and sold from the Avalon Drive Address.

15. On or about September 11, 2025, agents executed a search warrant at the Avalon Drive Address.

16. At approximately 6:00 a.m., law enforcement executed the search by surrounding and calling out occupants inside the residence. Five individuals, including **OWENS**, exited the residence. **OWENS** took approximately 20 minutes to exit the Avalon Drive Address. Law enforcement surrounding the house could hear movement inside the residence. During the initial law enforcement sweep of the RESIDENCE after all occupants exited, officers saw a clear plastic bag that appeared to contain a white powdery substance inside of the toilet. Based on my knowledge, training, and experience, I know that individuals often discard narcotics into toilets before law enforcement conducts search warrants. I also know that individuals will

often hide contraband, including firearms, before law enforcement executes a search warrant.

17.   Agents then proceeded to search the Avalon Drive Address.

18.   After the occupants exited, agents interviewed **OWENS** after reading him his *Miranda* rights. **OWENS** denied selling narcotics or touching any firearms that may be in the Avalon Drive Address. **OWENS** advised that he uses "boy" (fentanyl or heroin) and methamphetamine. He also said that law enforcement may find scales in his bedroom. **OWENS** advised that his girlfriend ("Person 2") stays in the bedroom with **OWENS** or in the living room. **OWENS** advised that he also used the bathroom prior to exiting the Avalon Drive Address.

19.   Law enforcement interviewed Person 2 after they exited the Avalon Drive Address. Person 2 advised that she slept in **OWENS's** bedroom with **OWENS**. Person 2 said that no narcotics or firearms found in the **OWENS's** belonged to them.

20.   Another occupant that departed the Avalon Drive Address ("Person 3") advised that she only stays at the Avalon Drive Address periodically because she has nowhere else to go. Person 3 said that the last time they observed **OWENS** sell narcotics was the previous day. **OWENS** sells both methamphetamine and fentanyl. Person 3 initially advised that they did not know if there were guns in the Avalon Drive Address, but later advised that Person 3 has observed **OWENS** with firearms inside the Avalon Drive Address. Specifically, Person 3 advised that **OWENS** keeps

8

guns in his bedrooms. Person 3 said that **OWENS** had a handgun and a "shotgun looking thing." Person 3 advised that when they woke up the morning of September 11, 2025, they observed **OWENS** shove something that looked like a shotgun in what they believed was a closet in the hallway.

21. During the search, agents found a 12-gauge, Pro Series S, Serial Number PSS08468AA inside a bedroom on the west side of the Avalon Drive Address. Agents also found two handguns in this bedroom. **OWENS** had earlier told law enforcement that this bedroom was used by another resident of the house. This other resident was not present when the search warrant was executed. Based on my knowledge, training, and experience, I believe that when Person 3 said that they observed **OWENS** shove what they believed to be a shotgun in a closet, they were referring to the small bedroom on the west side of the residence where the shotgun and handguns were located during the search.

22. Additionally, while in **OWENS's** bedroom, agents found numerous rounds of ammunition. These rounds included approximately four shotgun shells and approximately 40 rounds of Sig Saur 9mm. Agent also found approximately 65 .40 caliber S&W rounds in a dresser inside of **OWENS's** bedroom. These rounds were in the same dresser as **OWENS's** wallet (with his Florida ID and his Department of Corrections inmate identification card inside). A separate black case containing numerous rounds of assorted ammunition was also found in OWENS's bedroom.

23. On September 11, 2025, an ATF Special Agent examined the ammunition located inside of **OWENS's** bedroom. The Special Agent advised the approximately four shotgun shells, 40 rounds of Sig Saur 9mm, and approximately 65 rounds of S&W .40 caliber were manufactured outside the State of Florida. As such, the ammunition would have moved in and effected interstate commerce prior to its arrival in Florida.

24. I have reviewed **OWENS's** criminal history. **OWENS** is a convicted felon who has several felony convictions. For example, **OWENS** was convicted of trafficking in fentanyl on or around July 20, 2023, in Pasco County, Florida. *See* Case No. 2021-CF-5046-CF (Pasco County Ct.). He was sentenced to a term of imprisonment of three years.

25. Based on the foregoing, I believe that probable cause exists to believe that **KING** committed violations of and **OWENS** committed violations of 21 U.S.C. §§ 846, 841(b)(1)(B)(vi). Therefore, I respectfully request that the Court approve the attached criminal complaint and issue arrests warrants for **KING** and **OWENS**.

Respectfully submitted,

David B. Bannan
Special Agent
Federal Bureau of Investigation

Affidavit submitted to me by reliable electronic means and attested to me as true and accurate by telephone or other reliable electronic means consistent with Fed. R. Crim. P. 41(d)(3) before me this _____ day of September, 2025.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge